## Case No. 16,583.

### UNITED STATES v. TWO HUNDRED AND SIXTY–NINE AND ONE–HALF BALES OF COTTON.

[Woolw. 236; [1] 25 Law Rep. 451; Rev. Cas. 1.]

Circuit Court, D. Missouri. Oct., 1868.

PROCEEDINGS IN PRIZE—JURISDICTION ON RIVERS —ATTACK FROM SEA—THE LOCALITY— THE VESSELS AIDING.

1. Great laxity is tolerated. in proceedings in prize courts: and irregularities, such as the captors not being parties, and not bringing the prize into court for adjudication, may be corrected.

2. The admiralty courts of the United States have jurisdiction in prize over captures made on the Mississippi river during the current Rebellion.

3. There are certain reasons, founded on the general principles of international law, why every capture on the high seas, jure belli, shall be carried before a prize court.

4. The exclusive jurisdiction of the admiralty over the great rivers is now well established.

5. The naval contests thereon have been of great magnitude during the current Rebellion, and numerous captures, jure belli, have been made. and the so-called "Confederate States" have been recognized as belligerents.

6. The prize jurisdiction has been sustained only when the naval arm has made, or co-operated in making, or, by its presence and active assistance, contributed immediately in effecting the capture.

7. The force operated from the sea.

8. The capture has been of some place used in naval warfare, as an island, &c.

9. Vessels not commanded by government officers, nor armed, and used merely as transports for troops, are not war vessels, and do not bring within the prize jurisdiction a capture on land by military forces.

[Appeal from the district court of the United States for the district of Missouri.]

This was a proceeding in prize for the adjudication of certain cotton. The facts [2] appear from the libel, which was as follows: United States of America, Eastern District of Missouri, ss.: In the District Court. of Said United States for Said Eastern District. To the Honorable Samuel Treat, Judge of Said District Court: The libel of William W. Edwards, attorney of the United States for said Eastern district of Missouri, who, being here in his own proper person, prosecutes. in the name and on behalf of the United States, against 269½ bales of cotton, marked "C. S. A." and other marks, and against all persons lawfully intervening for their interest therein, does hereby propound, allege. and articulately declare to this honorable court as follows:

Firstly. That said 269½ bales of cotton. marked as aforesaid, are now in the city of St. Louis, in the said Eastern district, and are in the possession and custody of the marshal of this court; that the same were first seized by said marshal on the 13th day of October, A. D. 1862, the said bales of cotton being, at the time of said seizure, on board of the steamboat John H. Dickey, and on the Mississippi river, a public navigable water of the United States, and within the admiralty and maritime jurisdiction of this court.

Secondly. That on or about the 26th day of September, A. D. 1862, in pursuance of the in-

---

[1] [Reported by James M. Woolworth. Esq., and here reprinted by permission. 25 Law Rep. 451, contains only a partial report.]

[2] NOTE [from 25 Law Rep. 451]. This lot of cotton. after having been captured, as stated in the opinion, was brought to Helena, and there got into private hands. It was taken from Helena to Memphis as private property, there seized by the quartermaster. and shipped to the military authorities at St. Louis, by whom it was turned over to the collector of that port. He reported it to the district attorney for violation of the revenue laws. That officer filed a libel against the cotton for violating the "nonintercourse" act of July 13, 1861 [12 Stat. 255], and, also, to provide for contingencies which need not be here described, filed a libel, or rather information, containing two counts,—one under the act of August 6, 1861 [12 Stat. 319], "to confiscate property used for insurrectionary purposes," and one under the confiscation act of July 17, 1862 [12 Stat. 589]. He besides filed the libels which gave rise to the present decision. Various conflicting claims were filed, and the claimants excepted to the second and third libels, principally on the ground of jurisdiction. The constitutionality of the confiscation act of July 17, 1862, was also discussed at bar, but not decided; Judge Treat of the district court holding, in a very able and elaborate opinion, covering all those points, that this cotton was not, within the 7th section of that act. either "found" or "first brought" within the Eastern district of Missouri, as appeared from the libel, and that, therefore, under that act, the court had no jurisdiction. This decision, left the second libel standing upon the count based upon the act of August 6th, and this case is still pending in the district court. The exceptions to the third or "prize" libel were sustained, and the libel dismissed, and from this decree an appeal taken, the result of which is seen in the present decision. The court states that the libel is not "aptly framed" as a prize libel. This was intentional. It is obvious that the proceedings previous to the filing of the prize libel were, as prize proceedings, wholly irregular. None of the machinery of prize courts was prepared or in operation at St. Louis. The object was to file such a libel as would raise on its face the objections that would certainly be made. If the case were really one of prize jurisdiction, irregularities of procedure would not divest the jurisdiction. The Dos Hermanos, 2 Wheat. [15 U. S.] 76.

structions of the president of the United States, Captain William Sands, being a duly appointed and commissioned officer of the army of the United States, and being there in the military service of the United States, in the army called the "Army of the Southwest," the said army being then stationed near the town of Helena, in the state of Arkansas, and then and there operating in military warfare, under and by command of the president of the United States, against the rebels in arms against the government of the United States; that the said Captain Sands, with and in command of a battalion of the 10th regiment of Illinois cavalry, which was then and there a part of said army of the Southwest, and then and there in the military service of the government of the United States, and acting under the order of the president thereof against said insurrectionists, left the encampment of said army near said Helena, and embarked on the Mississippi river on board the boats Jatan and Conway, which were then and there vessels of the United States, and in the service of the government thereof, for the purpose of going on an expedition of war, called a scouting expedition or reconnaissance, into a certain district of the state of Mississippi, held, possessed, and controlled by said insurrectionists, so in arms against said government of the United States; that said detachment, being so embarked, did proceed by way of the Mississippi river, and land in said state of Mississippi, and then and there penetrated into the country so occupied and controlled as aforesaid; that said captain and his command, while so employed, discovered, and by force of superior numbers overpowered, certain insurrectionists then and there in arms against the government of the United States, and commanded by a certain insurrectionist styling himself a lieutenant in the army of the Confederate States of America, and took said so-called lieutenant prisoner; that said captain and his command captured from, and then and there took out of the possession of, said rebels in arms, the said 269½ bales of cotton, together with some twenty or thirty other bales of cotton, and seized the same as a prize of war; that said cotton was captured, seized, and taken away by said soldiers of the United States, in the service of the government thereof, in time of war, when on a hostile expedition into an insurrectionary state and district, from insurrectionists waging war, and aiding and abetting the rebellion against the government of the United States; that it was by said soldiers of the United States conveyed to said river, and was taken thence to said state of Arkansas, within the lines of the army of the United States in said state; that said 269½ bales, after being detained there, were afterwards brought to said St. Louis. And the said attorney of the United States says, that said 269½ bales of cotton were, on being so captured, ever since have been, and yet are,

the property of the United States, and of no other person whatever; that as property so captured in war from insurrectionists in arms against the government, by troops of the United States, the said 269½ bales of cotton are forfeited and confiscated to the United States.

Thirdly. And for other and further matter in this behalf, the said attorney for the United States says, that in addition to the matters set forth in the second article of this libel, it is also true that the said detachment was greatly aided and assisted in said capture by the said vessels so in the service of the United States as aforesaid; that said detachment embarked on board said vessels on the said river, being then and there a public navigable water of the United States, and within their admiralty jurisdiction, and was by said vessels conveyed on said water nearly to the place of said capture, at or near which place the said vessels, their officers and crews, co-operated with said troops in making said capture; that said capture was made by the combined force of said troops and said vessels, with their officers and crews, and could not have been made except by such co-operation and assistance. But the said attorney is not informed in regard to the names of any of said officers or crew of either of said vessels, the said cotton not having been brought by them, or any of them, within the jurisdiction of this court.

Fourthly. That all and singular the premises are true, and within the jurisdiction of the United States, and of this honorable court; that the matters hereinbefore stated are matters public and notorious.

Wherefore the said attorney on behalf of the United States prays the usual process and monition, according to the course of practice in such cases, and that all persons claiming any interest in the said property, or any part thereof, may be cited to answer the premises; and that all due proceedings being had, the said 269½ bales of cotton may be condemned as forfeited, and for such other orders, decrees, and relief as is right and proper in the premises.

To which libel Daniel Wolf interposed his exceptions as follows: The United States v. 269½ Bales of Cotton. Libel No. 940, 1862. In the District Court of the United States for the Eastern District of Missouri. To the Honorable Samuel Treat, Judge of Said District Court: Daniel Wolf, claimant of ninety-three bales marked "D. W." of said 269½ bales of cotton, now comes and demurs and excepts to said libel, on the following grounds, and for the causes following: (1) That the supposed facts alleged in said libel do not constitute a cause or ground of forfeiture or confiscation of said 269½ bales of cotton, or any portions thereof, under any law or usage of the United States or of nations. (2) That the supposed facts alleged in said petition do not bring the said cause and

subject matter of said libel within the jurisdiction of this court. (3) Because said libel is indefinite and vague in its statements, and bad for general uncertainty in that respect. (4) Because the subject matter of complaint, as in said libel stated, is not a matter or subject for prosecution by libel.

And William M. M'Pherson also interposed exceptions as follows: The United States of America v. 269½ Bales of Cotton. No. 940. In the District Court of the United States for the Eastern District of Missouri. To the Honorable Samuel Treat, Judge of Said District: The exceptions of William M. M'Pherson to the libel of William W. Edwards, attorney of the United States for the Eastern district aforesaid, alleges that: First. The court has no jurisdiction in the premises, as the same is set forth in said libel. Second. That any forfeiture for the matters and things in said libel mentioned, would be contrary to the constitution and laws of the United States. Third. That upon the matters and things in said libel contained, this court could give no judgment against the libelled goods. Wherefore the said claimant is not bound to answer the same, and prays that said libel may be dismissed.

In the district court these exceptions were sustained and the libel dismissed. [Case unreported.] Thereupon the United States appealed to this court.

Mr. Noble, for the United States.
Mr. Glover, for claimants.

MILLER, Circuit Justice. This is an appeal from the decree of the district court for the Eastern district of Missouri, dismissing the libel upon exceptions taken to its sufficiency. In the prayer for an appeal, the case is alleged to be one of prize of war. The counsel state distinctly that they so understand it; and that the district court, in hearing it, was sitting as a prize court in admiralty. No claim is made under any of the acts concerning confiscation or forfeiture of the property of rebels in the present war, nor under any act prohibiting trade or intercourse with the enemy. The proceeding against the property in question is based solely on the ground that it is captured jure belli; and application is now made to this court for condemnation of its proceeds as prize of war.

But very few lawyers of the present day have any experience in prize courts; and it is no reflection upon the general professional character of the learned counsel who drew the libel in this case to say, that though perhaps more nearly a prize libel than anything else, it is not, as such, aptly framed. In substance the statement of facts in the libel, on which the condemnation of the cotton is asked, is as follows: On the 26th day of September, 1862, Captain William Sands, an officer of the United States army, embarked at Helena on the boats, Jatan and Conway, with a battalion of the 10th regiment of Illinois cavalry, said

"vessels being vessels of the United States, and in the service of the government thereof." It was a scouting expedition or reconnaissance into a certain district in the state of Mississippi, then held and controlled by the enemy. The detachment, proceeding by the river and by land, penetrated into the district just mentioned, and there came upon, and by force of arms overpowered, a body of the enemy's troops. They took prisoner a lieutenant in command, and from the possession of the force under him took the 269½ bales of cotton herein libelled. These were marked "C. S. A.," and were seized as prize of war. The soldiers conveyed the cotton to the river; thence it was taken to the state of Arkansas, and it was finally brought to this city. It is averred that it is now the property of the United States, and is forfeited and confiscated. It is then alleged that the Mississippi river is within the admiralty jurisdiction of the courts of the United States; that the capture was made by the joint action of the vessels aforesaid and the soldiers, and that it could not have been made without the co-operation of the vessels.

There are many irregularities in the proceedings, as disclosed by the record. Thus, the captors are not parties to this proceeding, and did not bring the prize into any court for adjudication. Moreover, as appears from the certificate of the clerk, the property has been sold, and the proceeds cannot be remitted to this court, because they are held to answer to other libels, filed before the present one, on the instance side of the district court. But these irregularities are not fatal to the proceeding. Great laxity is tolerated in prize courts. This is stated with his customary fulness and learning by Mr. Justice Story in The Emulous [Case No. 4,479]. And if this case shall be found, in its substantial elements, to constitute prize of war, the libel may be reformed, and the proceedings corrected.

The first point which is pressed upon the attention of the court is, that on the waters of the Mississippi, remote from the ocean, and from any territory belonging to foreign or independent nations, there can be no captures that call for the interposition of a prize court. I confess that, previous to the argument of the case, and the investigation which I have made in consequence, I was strongly inclined to that opinion. There are certain reasons, founded upon the general principles of international law, why every capture upon the high seas, jure belli, shall be carried before a prize court. The oceans and seas are the great highways of the world. Free transit over them is the common right of all nations; exclusive jurisdiction or control is possessed by none. Civilized states also claim and exercise the right of trading and mooring their ships in each other's ports; and, subject to such restrictions as each government may impose for its own security, or the protection of its own trade, this is conceded by the rules of international law. And when nations go to war,

when hostile fleets encounter, and ports are blockaded, the law of nations, where for peace it has established these privileges and limitations, calls into operation, as a recognized part of itself, the laws of war. There must be a jurisdiction administering those laws, and this is found alone in the prize courts. These courts decide questions of the existence of such a war as confers belligerent rights; of the validity of blockades; of the lawfulness of captures; and various other matters which no other court can reach, and which, affecting as they do the rights of neutrals and enemies, who are not subject to the jurisdiction otherwise than by the international laws applicable to a state of war, can be determined only by those laws.

It is urged, with great force, that none of these principles are necessary, or can properly be applied, on a river wholly within the boundaries of one government; that all captures made thereon should be subject alone to the law of the country which has the sovereignty, to the exclusion of those rules of the law of nations which govern the common highways of the world. However conclusive this argument might have been fifty years ago, if taken in the admiralty court of Great Britain, there are many reasons why it should not, in more modern times, in an American court, and during the present war, have the same force.

The supreme court of the United States, in The Prize Cases, 2 Black [67 U. S.] 635, at the last term, decided that between the government of the United States and the rebels a war exists, which confers upon our government at least, the rights of war; that the success of the rebels has enabled them to establish military lines, south of which is enemy's territory and property. This must apply as well to the waters within those lines, as to the land; and it would seem necessarily to bring the laws of war into action as to captures made on those waters. While it was the well settled doctrine of the admiralty court of England, that its jurisdiction as an instance court did not extend beyond tide water, and even in tide water was excluded from all places in the body of a county, as from havens, and within reaches between headlands, no such restrictions were placed upon the jurisdiction of the prize courts.

In the case of Lindo v. Rodney, reported in 2 Doug. 613, note, Lord Mansfield said: "As to a matter done in the ports, havens, or rivers within the body of a county of the realm, the admiralty is excluded. But the prize court has uniformly, without objection, tried all captures in ports, havens, &c., within the realm. It happens often. We all know of such cases."

In the case of The Genesee Chief, 12 How. [53 U. S.] 443, the supreme court of the United States says that the reason why the English courts of admiralty hold tide water to be the limit of their jurisdiction, is that the rivers of England are navigable only as far as the tide ebbs and flows; and tide water and nav-

igable water being thus rendered synonymous and interchangeable terms, the former has been substituted for the latter as more convenient and easily determinated. Of the lakes in the interior of this continent, in the same decision, it is said: "These lakes are in truth inland seas. Different states border on them on one side, and a foreign nation on the other. A great and growing commerce is carried on upon them, between different states and a foreign nation, which is subject to all the incidents and hazards that attend commerce on the ocean. Hostile fleets have encountered on them, and prizes been made; and every reason which existed for the grant of admiralty jurisdiction to the general government on the Atlantic seas, applies with equal force to the lakes. There is an equal necessity for the instance, and for the prize power of the admiralty court to administer international law, and if the one cannot be established, neither can the other."

These sentences are pregnant with meaning; and at the time they were delivered, except that we have here no foreign nation, every word of them applied with equal force to the great river on whose banks we are now sitting. And since the same court has recognized a belligerent foe in the rebel forces, that difference for our present purpose has no longer any significance. Hostile fleets have encountered upon its waters, prizes have been made, and it has become the theatre of naval contests of greater magnitude than, at the time that opinion was rendered, were dreamt of, on the lakes. In the case last mentioned, the initiation and rapid increase of our inland steam navigation, and the new relations of commerce which it established, were given as additional reason for the recognition of admiralty powers in the western waters. But gunboats with iron plates and immense guns capable of demolishing the strongest forts and intrenchments, had not then been thought of. The present war has developed on these rivers a naval power unknown to former times. In a case like the present, we cannot shut our eyes to these facts. Our gallant tars have been sent from the seaboard to man these vessels on the rivers. When, by their valor, and by the use of vessels of war, they have captured an enemy's vessel, shall they have no court in which their prizes may be condemned? The introduction of steam, as a motive power, into vessels of war, enabling them to penetrate on inland waters, far into the interior of the country, has revolutionized naval warfare in this respect, as in many others. The presence in the waters of this great stream of a hostile fleet of a foreign nation, is among the contingencies for which we must be prepared. Again, captures may be made on this river, and others similarly situated, of property belonging to neutrals, who have a right, before it is condemned to the captors, to the judgment of a competent court upon their claims. We have then a court which, by the constitution and laws, is authorized to deter-

mine this question of prize or no prize; and we see that the exigency may arise, in which the question between the captor and the claimant should. by the adjudication of this court, be answered. We certainly cannot decline the jurisdiction, and, in the face of the fact. hold. that on the Mississippi river no such case can arise.

The question then presents itself. whether the facts of this capture, as set forth in the libel, make a case of prize of war. The appellant insists that the case is one of conjunct capture by land and naval. or, at least, by land and water forces; and that this circumstance brings it within our jurisdiction, as a prize court. This position may seem to be supported by the language of Mr. Justice Story in the case of The Emulous [Case No. 4,479]. He says, on page 575: "However the question may be, as to the right of the admiralty to take cognizance of mere captures made on the land, exclusively by land forces, as to which I give no opinion, it is very clear that its jurisdiction is not confined to mere captures at sea. The prize jurisdiction does not depend upon locality, but upon the subject matter. The words of the prize commission contain authority to proceed upon all, and all manner of captures, seizures, prizes and reprisals, of all ships and goods, that are and shall be taken. The admiralty therefore not only takes cognizance of all captures made at sea, in creeks, havens, and rivers, but also of all captures made on land, where the same have been made by a naval force, or by co-operation with a naval force. This exercise of jurisdiction is settled by the most solemn adjudications." But this general language of the learned judge is to be qualified by the case then before him. The property proceeded against was 550 tons of pine lumber, part of the cargo of the American ship Emulous, which was seized as enemy's property after the same had been discharged from said ship, and, as the statement of the case as reported by Gallison shows. while afloat in a creek or dock at New Bedford, where the tide ebbs and flows. And the learned judge expressly says: "Had it been landed and remained on land, it would have deserved consideration, whether it could have been proceeded against as prize under the admiralty jurisdiction; or whether, if liable to seizure and condemnation in our courts, the remedy ought not to have been pursued by a process applicable to municipal confiscations. On these points. I give no opinion." The case was carried to the supreme court, where the decree of the circuit court was reversed. The case is reported under the title of Brown v. U. S., 8 Cranch [12 U. S.] 110. In a dissenting opinion, characterized by the most extended and learned research, Mr. Justice Story expressly says: "As to the right of the admiralty to take cognizance of mere captures made on the land, exclusively by land forces, I give no opinion."

The case of The Rebeckah, 1 C. Rob. Adm.

227, decided in 1799, was a contest between the admiralty and the captors. The circumstances were, that the vessel, on putting into St. Marcou for safety, was fired at from the fort, and struck her colors. and was taken by a boat's crew sent out from the fort. St. Marcou was a small island. occupied exclusively as a naval station for naval supplies, and for the temporary accommodation of ships of war. The question was between the admiralty claiming the vessel as droit of admiralty, and the captors. Sir William Scott. in his judgment, holds it a maritime capture. because, although made from the shore, "the whole force, such as it is, upon this little spot. is entirely subservient to these vessels, and for their use, and for no other purpose, as the certificates declare. Such a place, so selected and so employed, is hardly to be considered as anything else than as a part or appendage of the naval force; it is a sort of stationary tender, rather attached to and dependent upon these vessels, than having the vessels attached to and dependent upon it. This peculiar character of the place distinguishes it most essentially from the case of a land fortress possessed by a military garrison. The capture then was effected by naval commissioned persons, using a force immediately subject to their use; and from its peculiar circumstances sufficiently naval in itself to be distinguished from an ordinary land force. subject to military persons. It is a maritime capture. effected regularly by a maritime force, and in a spot where the right of the admiralty had not yet commenced upon the thing itself at the time of the surrender." And he clearly indicates that, had the force by which the capture was effected been under the command of the military instead of naval officers. it would have been droit of admiralty. He says: "Upon this subject I entirely accede to what has been laid down, that a capture at sea, made by a force upon the land (which is a case certainly possible, though not frequent). is considered generally as a non-commissioned capture. and inures to the benefit of the lord high admiral. Thus, if a ship of the enemy was compelled to strike by a firing from the castle of Dover, or other garrisoned fortress upon the land, that ship would a droit of admiralty, and the garrison must be content to take a reward from the bounty of the admiralty, and not a prize-interest under the king's proclamation." And again, he holds that. even when naval forces land and use arms of the military. and fortifications by which to effect the capture, the result is the same.

This, then, is the case of a capture by naval forces of property on the same footing as if it were afloat.

The Island of Trinidad, 5 C. Rob. Adm. 95, decided in 1804, was a claim on behalf of several ships to share in the capture, among other things, of the island and its dependencies. Without entering into any consideration of the principle here involved, and occupying himself with a question whether the vessels

were present at the close of the conflict, the same learned judge pronounced some of them entitled to share in the capture of the island. This, then, is the case of a cápture by naval forces operating from the sea, of property on land.

The capture of The Chinsurah, Act. 179, decided in the high court of appeals in 1809, by Sir William Grant, was the case of the capture of the Dutch town and fort by a vessel of the squadron, and a detachment of the East India Company's troops. Previous to the capture, the Dutch East India Company had entered into many contracts with neighboring merchants for supplies of certain articles of merchandise. The governor of the place, among others, had entered into such contract with one Halsey, and had on account thereof advanced to him £23,200. At the time of the surrender, this contract remained unperformed, and the question was presented, whether it should be condemned for the English Company or for the naval forces, each seemingly claiming the whole fund. The court condemned the property generally as prize to the crown, to be distributed. From this sentence both parties appealed. The sentence was affirmed. The reasons for the judgment on the point before us here are not assigned. But it is plain that the case was one of conjunct capture, which was effected by operations from the sea, and by the aid of naval forces, and, as it would seem, all under the vice-admiral's command.

Nor does the case of The Thorshaven, Edw. Adm. 102, throw much light on the question. It is enough to say here that, whichever command should be deemed the captors, the capture was by naval forces operating in naval warfare.

In The Buenos Ayres, 1 Dod. 28, the single clause with which Sir William Scott commences his judgment shows the circumstances of the case, and how summarily the question of jurisdiction is disposed of by him. He says: "This is a proceeding originating in the capture of the Spanish settlement Buenos Ayres. A claim is set up by Captain Honeymoon and the other officers and crew of his Majesty's ship the Leda, to share as joint captors in the proceeds of the property captured at that settlement."

I think these cases as nearly support the jurisdiction as any English cases which can be cited. In this country, besides The Emulous [supra], we have the case of Six Hundred and Eighty Pieces Merchandise [Case No. 12,915]. These articles of merchandise were ferried across the Chowau river, in North Carolina, at Reddick's ferry, and landed on a wharf, preparatory to their being taken to Weldon. The river was at the time occupied by a naval force of the United States, for blockading and other purposes of war of the Rebellion. The goods were captured soon after they were landed by a force sent for the purpose from the United States steamer "Hunchback," under Lieutenant Calhoun. In his brief opinion, Judge Sprague says: "The authorities cited show that the jurisdiction of the admiralty over matters of prize certainly extends far enough to cover the circumstances of this case. How much farther it may extend it is not necessary to consider. Here, the merchandise being enemy's property, was ferried across a river occupied by our naval forces for all purposes of war, acting under strictly naval authority; and it was soon afterwards seized on the wharf by a naval force sent from one of our vessels for the purpose. It is not necessary to decide whether this property might not be liable to municipal confiscation or forfeiture on the instance side of this court, under any of the special statutes passed to meet this rebellion. It is not proceeded against as forfeited or confiscated, but for condemnation as prize of war; and I am satisfied that the admiralty jurisdiction of this court is sufficient to embrace the case."

In every one of the cases where the court has sustained its jurisdiction in prize, it appears that the force making the capture, or co-operating in the act, was the naval arm, or, by its presence and active assistance, it contributed immediately in effecting the capture; that it operated from the sea; that the place captured was an island, town, or fortress, itself established to resist naval attack, and to support and succor naval expeditions, and accessible from the sea, so that the attacking squadron could directly bring to bear upon it the stress of its armament. In the present case we do not discover any of these conditions. It is true there is an averment in the libel that the vessels, and officers, and crews co-operated with the troops in making the capture, and that it could not have been made without such co-operation. Perhaps if this allegation stood alone, under the very loose mode of pleading permitted in prize cases, the libel might be sustained, and the parties remitted to their proofs. But the libel, in its preceding part, sets out the substantial facts of the case, and the language just referred to is evidently but the conclusion deduced by counsel from those facts.

The facts thus stated, and not the legal conclusions drawn from them by the pleader, constitute the real foundation of the case, and we cannot reject as surplusage the part of the libel containing them. We must, for the present, consider them as constituting the case presented and relied on by the libellant. From that statement it is not at all inferrible that the vessels named were any part of the naval force of the United States. Indeed, we know that no naval force then existed in those waters. The gunboats were made a part of the navy by order of the government on the 1st day of October, several days after the capture. It is not supposed or alleged that any of these vessels were officered by government officers. They

were not even armed vessels, and could not take part in any action, or contribute in any manner. by belligerent force, to the capture. It is not shown that they remained after they landed the forces; and the fair inference is, that they did not. It is averred that the cotton was conveyed by the soldiers to the river, and that it was taken thence to the state of Arkansas; but it is not alleged that it was so taken by the vessels. In short, the entire statement is consistent with the fact that the vessels and crews were in the employment of the war department, and were used merely as transports to carry the troops; and it is consistent with no other supposition. It is also evident that the capture was not made on the banks of the river, but some distance inland, where the vessels could render no other assistance than to land the forces, and receive them again. I cannot conceive that the employment by the government of unarmed steamboats for the mere purpose of transporting troops from one point to another on the Mississippi river, can render every capture made by the troops or detachments so transported prize of war, and let in the crews and officers of those vessels to a share of the prize money. Such vessels are in no sense war vessels, and are neither·expected nor fitted to take part in engagements.

In The Cape of Good Hope, 2 C. Rob. Adm. 274, the same claim was interposed on behalf of vessels, which, by reason of many circumstances, were much more nearly connected with the service than these two steamers. Sir William Scott, in his judgment says: "In the next place, it is argued, that these ships were actually employed in military service, although there is no such averment in the plea. It comes out in evidence only (by which I must observe the other party is deprived of the opportunity of counterpleading) that their boats were employed in carrying provisions and military stores on shore: that was a service certainly, but not a service beyond the common extent of transport duty. They landed them, probably at the same time with the troops for whose use they were intended; and if not at the same time, still it is no more than what they were bound to do with the stores and provisions they carried." If now we consider the case as a capture on land of enemy's property, the question seems to me, notwithstanding Mr. Justice Story's intimation cited above, even if it can be allowed the force of an intimation, to be free from doubt. It is conceded that the history of neither American nor British jurisprudence furnishes an instance of the exercise of such a jurisdiction by a prize court, unless it has been conferred by statute. My own researches, and the far more laborious and learned examination of my brother who decided the case in the district court, confirm the propriety of the concession. Even in the cases which I have cited above, the·jurisdiction was con-

ferred by statute. In the cases of conjunct capture by the two arms of the service, the provision in the act of parliament was: "That in all conjunct expeditions of the navy and army, against any fortress upon the land, directed by instructions from his majesty, the flag and general officers, and commanders, and other officers. seamen. marines, and soldiers, shall have such proportionable interest and property as his majesty, under his sign manual, shall think fit to order and direct." [2 C. Rob. Adm. 287.] And in the other cases, the provision is contained in the 3d section of the prize act, and confers upon the ships of the crown power to capture "any fortress upon the land, or any arms, ammunition, stores of war, goods, merchandise, and treasure belonging to the state, or to any public trading company of the enemies of the crown of Great Britain upon the land."

The Army of the Deccan, 2 Knapp, 152, a leading case on the subject of military booty, in England, on account of the magnitude of the sum involved, and the great consideration upon which the decision was made, rested entirely on the army prize money act (54 Geo. III. c. 86).

In the case of Lindo v. Rodney, already quoted (decided A. D. 1782), Lord Mansfield said that he had caused the register to be examined as far back as A. D. 1690, and that he had also made an examination himself, and that no case had been found of the exercise of such a jurisdiction. Since that time, the wars of Bonaparte in Europe have occurred; the British wars in India and China; and our own wars of the present century, with Great Britain, and with Mexico. In each of them enemy's territory was invaded; and if the jurisdiction in question had been seriously supposed to exist, they must have afforded numerous instances of captures of valuable personal property on land, by land forces, where the aid of courts of prize would have been called into requisition. There are no such cases. But strong as the inference is, arising from this total absence of the exercise of such power for nearly two hundred years, during which we have records of the courts of prize, we are not left to that alone. Dr. Phillimore, in the third volume of his "Treatise on International Law" (side p. 186), speaking of prize courts, says: "It will be seen that by this tribunal, international justice is wisely, carefully, and honestly dispensed, and it is a matter of reasonable surprise that such a jurisdiction should have been strictly confined to sea prize, and without cognizance over land booty, except in cases where the two, owing to the co-operation of the army and fleet, have been blended together." He then goes on to show that land captures had probably at one time been a subject of the jurisdiction of the ancient court of chivalry, which, having fallen into desuetude, had left no successor to exercise its authority in this matter. He also states (side p. 197) that in 1840, a British

statute was passed to improve the practice, and extend the jurisdiction of the high court of admiralty, in which it was enacted that said court shall have jurisdiction to decide all matters and questions concerning booty of war, or the distribution thereof, which it shall please her majesty, by the advice of her privy council, to refer to the judgment of the said court; and in all matters so referred, the court shall proceed as in cases of prize of war. It would be difficult to find a stronger legislative implication of opinion, than that here given of the normal want of this jurisdiction in a court of admiralty.

In The Two Friends, 1 C. Rob. Adm. 271, Sir William Scott says: "I know of no other definition of prize goods, than that they are goods taken on the high seas, jure belli, out of the hands of the enemy; and there is no axiom more clear than that such goods, when they come on shore, may be followed by the process of this court. In such cases the common law courts hold they have no jurisdiction, and are even anxious to disclaim it. The case of The Ooster Eems [1 C. Rob. Adm. 284, note], which has been alluded to, was very different from this. In that case there was a material distinction as to the origin of the subject matter; for it was there expressly said by the great person who then presided 'that those goods had never been taken on the high seas, they had only passed in the way of civil bailment on delivery into civil hands, and were afterwards arrested on shore as a prize.' It was held that there was no act of capture on the high seas, and therefore that they were not to be considered as prize."

In the case of Elphinstone v. Bedreechund, 1 Knapp, 316, certain moneys of the Mahratta chiefs Nawobaoutra, with whom the British were at war, were seized. After the war, suit was brought in the municipal court of Bombay in an action of trover for the money, alleging that it had been seized after the war was ended. In that court the plaintiff recovered judgment, but on appeal to the privy council, that judgment was reversed, on the ground that it was a hostile seizure, made, if not flagrante belli, yet nondum cessante bello; and consequently the municipal court had no jurisdiction. But do they say that the plaintiff could have relief in a prize court? On the contrary, they say that if nothing was done amiss, recourse could be had only to the government for redress.

In all the works on international law, captures of personal property by land forces on land are spoken of as booty. That term is used, as we have already seen, in the extract from Phillimore, in contradistinction to the term "prize." See Wheat. Int. Law, p. 405, and Mart. Law Nat. pp. 288, 289. Vattel, in his Law of Nations (page 365), says: "As the towns and lands taken from the enemy are conquests, all movable property taken from him comes under the denomination of 'booty.' This booty naturally belongs to the sovereign making war, no less than conquests. But the sovereign may grant the troops whatever share of booty he pleases." In the note on page 288, Mart. Law Nat., it is said that the distribution of booty between sovereign and soldiers depends on the military code of the state to which they belong. It is a matter that does not come within the law of nations. By article 58 of the articles and rules of war adopted by congress in 1806 (2 Stat. 366), "all public stores taken in the enemy's camp, towns, forts, or magazines, whether of artillery, ammunition, clothing, forage, or provisions, shall be secured for the service of the United States; for the neglect of which the commanding officer is to be answerable."

In the case of Brown v. U. S., 8 Cranch [12 U. S.], 110, Mr. Justice Marshall, delivering the opinion of the court, says: "It is urged that, in executing the laws of war, the executive may seize and the courts condemn all property which, according to the modern law of nations, is subject to confiscation, although it might require an act of the legislature to justify the condemnation of that property which, according to modern usage, ought not to be confiscated. This argument must assume for its basis the position that modern usage constitutes a rule which acts directly upon the thing itself by its own force, and not through the sovereign power. This position is not allowed. This usage is a guide which the sovereign follows or abandons at his will. The rule, like other precepts of morality, of humanity, and even of wisdom, is addressed to the judgment of the sovereign; and although it cannot be disregarded by him without obloquy, yet it may be disregarded. The rule is in its nature flexible. It is subject to infinite modification. It is not an immutable rule of law, but depends on political considerations which may continually vary. Commercial nations, in the situation of the United States, have always a considerable quantity of property in the possession of their neighbors. When war breaks out, the question what shall be done with enemy property in our country, is a question rather of policy than of law. The rule which we apply to the property of our enemy, will be applied by him to the property of our citizens. Like all other questions of policy, it is proper for the consideration of a department which can modify it at will, not for the consideration of a department which can pursue only the law as it is written. It is proper for the consideration of the legislature, not of the executive or judiciary." The great judge, and the court for which he spoke, proceeds upon the doctrine of the definition of Sir William Scott, quoted above. The property in question was not captured on the high seas, and although it had been but imperfectly landed, yet as it had been placed beyond the action of the water, it was removed from the prize jurisdiction. Mr. Justice Story, in

his dissent, insists that the jurisdiction extends to captures on land by a naval force. And it is in this, as well as in several other positions of his very learned opinion, that he is overruled by the court. The result of the case, in the court of final resort, certainly is, that property on land is not, without the aid of the statute, liable to capture and condemnation as prize of war.

Slocum v. Wheeler, 1 Conn. 429, was an action for trespass, for breaking and entering the plaintiff's dwelling-house on an island in the state of Massachusetts, and taking and carrying away several articles of personal property. The defendants justified, as the commander and crew of a boat commissioned by the president as a privateer, and a condemnation of the property by the United States district court as prize of war. The jurisdiction was questioned, on the ground, among others, that the alleged capture was made on the land. · The discussion at the bar seems to have been exhaustive, and the decision made on ·great consideration. Chief Justice Swift delivered the opinion of the court, and he says on this subject: "It further appears from the record, that the property in question was taken on the island of Nashawinna, in the district of Massachusetts, within the territorial limits of the United States, and not on the high seas, or within the British dominions. The act of congress and the commission of the president gave the defendants no authority to capture British effects in such place. They could not be lawful prize of war. The district court had no jurisdiction; and the sentence of condemnation is no protection to the defendants."

However desirable it may be that, in a war between nations, there should exist a tribunal similar to the prize court, to administer the law of nations with reference to property captured on land, we find no warrant for asserting that any such authority exists in the admiralty courts of the United States, unless the circumstances of the capture show some element of a force operating from, or on, the water, which would bring it within the recognized rules on that subject.

As a result of these views, the decree of the district court dismissing the libel will be affirmed, unless the district attorney, upon further consideration, shall be of opinion that he can make a case on the facts which will justify the condemnation of the property libelled as prize of war; in which case he is at liberty to amend his libel as he may think proper.

NOTE. Since the above decision, the Banda and Kirwee Booty Case. L. R. 1 Adm. & Ecc. 109, has been decided in the high court of admiralty of England. In his judgment Dr. Lushington says: "But with respect of booty—property captured on land by land forces—the court of admiralty had no jurisdiction until the passing of 3 & 4 Vict. c. 65 " He then sets out the section of the statute, and the order in council issued in pursuance of the act.